PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Kelsey and Roush, JJ., and Lacy, S.J.

CELIA A. RAFALKO, AS TRUSTEE
OF THE DIMITRI GEORGIADIS TRUST

OPINION BY
v. Record No. 141533                     JUSTICE S. BERNARD GOODWYN
                                         November 5, 2015
PAUL D. GEORGIADIS, ET AL.

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Lee A. Harris, Jr., Judge

In this appeal, we consider whether the circuit court erred in denying a demurrer and holding that letters written to an attorney and a beneficiary did not violate a trust's no contest clause.

BACKGROUND

Dimitri B. Georgiadis (Dimitri) established a revocable trust on December 21, 1989 that designated his new wife, Margaret Georgiadis (Margaret), and his only children, two sons from a previous marriage, Paul Georgiadis (Paul) and Basil Georgiadis (Basil) (collectively, the sons), as beneficiaries. The sons were named co-trustees of that trust.

On August 27, 2012, Dimitri amended and restated the trust (August trust). The August trust removed the sons as co-trustees and appointed Dimitri as the trustee with Celia Rafalko (Rafalko or trustee) as the successor trustee after his death. Further, the August trust eliminated the previously required distribution to the sons upon Dimitri's death. Instead, Margaret was made the income beneficiary of those funds, thus deferring any distribution to the sons or other descendants until after Margaret's death.[1]

---

[1] According to Rafalko, under the terms of the 1989 Trust, prior to the August 27, 2012 amendment, the sons would have received a distribution of approximately five million dollars upon the death of their father.

The sons complained to Dimitri about the changes to the trust and they exchanged several emails. The sons expressed their displeasure with their father not providing for them or their families during Margaret's lifetime. They also questioned the appointment of Celia Rafalko, whom they believed to be a close friend of their stepmother, as the contingent trustee of the trust.

Dimitri died on December 3, 2012. Paul wrote a letter dated January 3, 2013 to Timothy H. Guare (Guare), the attorney who drafted the August trust, asking him to preserve documents relating to Dimitri's estate plan, and stating that "the testamentary documents purportedly executed in your office on or about August 27, 2012 by my father shortly before his death will be the subject of a contest." On January 4, 2013, Paul wrote a letter to Margaret asking her to agree with the sons to terminate the August trust and distribute its assets with one-third going to her and one-third to each of the sons, claiming it would be in their mutual best interests to do so. The letter also warned that "[s]hould we be forced to contest the August 27, 2012 will and trust and file suit to set them aside," Basil and Paul would assert that there was undue influence upon Dimitri and challenge Dimitri's testamentary capacity when the changes were made.

Soon after Paul had sent the letters to Guare and Margaret, Paul and Basil received separate letters from Rafalko, sent pursuant to Code § 64.2-775, which provided a copy of Dimitri's will and trust. Unbeknownst to the sons, the testamentary documents executed by Dimitri on August 27, 2012 had been superseded; Dimitri amended, ratified and reconfirmed the August trust on September 21, 2012 (September trust). The September amendments added a provision allowing the trustee to distribute the trust assets to a charity of his or her choosing if Margaret and Dimitri died and no beneficiaries remained. Further, the September amendments added Article VII(L), which provided as follows in relevant part:

> L. No Contest Clause and Release of Claims. I intend to eliminate the
> possibility that any beneficiary of mine will challenge the decisions that I have

2

made concerning the disposition of my assets during my lifetime or at my death, and my Trustee shall take all appropriate steps to carry out this intent. Accordingly, I direct the following:

1. Absent proof of fraud, dishonesty, or bad faith on the part of my Trustee, if any beneficiary or potential beneficiary under this trust agreement shall directly or indirectly, by legal proceedings or otherwise, challenge or contest this trust agreement or any of its provisions, or shall attempt in any way to interfere with the administration of this trust according to its express terms, any provision I have made in this trust agreement for the benefit of such beneficiary shall be revoked and the property that is the subject of such provision shall be disposed of as if that contesting beneficiary and all of his or her descendants had predeceased me. Absent proof of fraud, dishonesty, or bad faith on the part of my Trustee, the decision of my Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets under this provision shall be final.

2. My Trustee shall obtain from each then living adult child and adult grandchild of mine a written release of any and all legal claims that such child or grandchild might make against the personal representative of my estate, my Trustee, any person who acted as my attorney-in-fact under a power of attorney executed by me, or any beneficiary under this trust agreement, relating to the conduct of any financial affairs prior to my death and the disposition of assets passing pursuant to my will, this trust agreement, any beneficiary designation that I may have executed during my lifetime, or my decision to cause assets to be titled in joint names with rights of survivorship with myself and another individual as joint owners.

On January 7, 2013, Basil sent a letter to Margaret disavowing himself from the January 4 letter written by his brother. Neither Basil nor Paul were aware of the September amendments to the trust until after Paul had sent the letters.[2]

In a letter dated January 31, 2013, Rafalko informed the sons that she was considering whether the letters sent by Paul violated the no contest clause and asked them for any information "you believe might bear on my decision," in writing on or before February 15, 2013. As required by the September trust, she also sent releases to be signed by the sons. She gave them thirty days to execute and return the releases. Rafalko acknowledges receiving the

---

[2] The circuit court attributed the letters to both Paul and Basil despite the fact that Paul authored both letters. Paul and Basil do not assign error to this finding.

3

releases, which were signed on February 19, 2013 by both sons, and by which they released all claims concerning any challenge to the will or the trust or to their administration.

In providing information solicited by Rafalko, Paul's counsel informed her counsel that Paul was unaware of the no contest clause when he wrote the letters, would not be challenging or interfering with the administration of the trust in any way and that the "clear import" of the January 4 letter was "to introduce the concept of a non-judicial settlement agreement," expressly authorized by statute. He also claimed that the specter raised concerning challenging the August trust was at most a threat which did not constitute a challenge, contest or interference with the administration of the September trust. However, her counsel noted in his memorandum that he had been told that if Rafalko decided that Paul had violated the no contest clause, Rafalko would "be in for a dog fight." Basil's explanation admitted that he "was aware of Paul's January 4 letter when he wrote it, but thereafter immediately disavowed it."

In a letter dated May 28, 2013, Rafalko notified the sons that she had decided that the letters sent by Paul violated the no contest provision. Rafalko stated: "I have concluded that both of you have violated the No Contest Provision of the Trust. Therefore, neither of you is qualified to take a share of the Trust assets, and the descendants of each of you are also barred from taking a share of the Trust assets." Rafalko attached a memorandum drafted by her attorney. The memorandum concluded that the letters written by Paul were "an attempt" to "interfere" with the administration of the trust "according to its express terms," which justified disqualifying Dimitri's descendants as beneficiaries to the trust and that ignorance of the "no contest" clause was irrelevant.

On June 24, 2013, the sons filed suit in the Henrico County Circuit Court seeking a declaratory judgment that the sons' conduct did not trigger the no contest clause and that they

4

and their descendants are rightful beneficiaries of the trust. They alleged that Rafalko's interpretation of the no contest clause was arbitrary and capricious, contrary to law and public policy, and contrary to Dimitri's intent. They also argued that neither of them had taken any legal steps to contest the trust or interfere with its administration and that the letters they sent to Guare and Margaret did not violate the terms of the no contest clause.

Rafalko demurred, arguing that the sons failed to allege that her decision was a product of bad faith, dishonesty or fraud and to plead any facts supporting a finding of bad faith, dishonesty or fraud. In response, the sons argued that Virginia law provided the court authority to review Rafalko's decision to ensure she was abiding by the terms of the trust even if she was not acting in bad faith. Alternatively, the sons argued that they had alleged in their complaint that Rafalko's decision was arbitrary and capricious, and that this allegation was enough to allege bad faith. The circuit court overruled the demurrer, finding that the complaint alleged that Rafalko did not act in conformity with the trust language, so there were sufficient grounds alleged for the action to go forward.

After hearing evidence, upon trial of the matter, the circuit court issued a letter opinion that construed the no contest provision. The circuit court ruled that the language of the no contest clause limited its applicability to challenges directed at the September 21, 2012 trust documents. The circuit court ruled that

> [t]he use of the word "this" instead [of] words such as "any prior agreement" or the agreement or specifically mentioning all agreements must result in the conclusion that Mr. Georgiadis intended to require forfeiture if any of the acts described were aimed at this agreement, dated September 21, 2012. The letters in question specifically addressed the August 27, 2012 trust and did not address the trust with the added provisions of September 21, 2012.

(Emphasis in original.) It interpreted the no contest clause language "this trust agreement," to mean the testamentary trust agreement documents executed on September 21, 2012 and not the

5

ones executed in August or earlier. Therefore, the circuit court concluded any acts that would cause forfeiture had to be directed at the trust as it existed after the addition of the September amendments for the no contest clause to be applicable. The court found that the sons did not violate the no contest clause because their letters specifically addressed the August 27, 2012 trust documents and did not challenge the execution or operation of the September trust. Therefore, "no acts were done that would allow the trustee to enforce" the no contest provision added on September 21, 2012.

Rafalko filed a motion for reconsideration, claiming that the circuit court had based its decision on a misquotation of the no contest clause because it inserted the word "agreement" after trust in its rendition of the no contest clause. Further, Rafalko argued that the sons presented no evidence that she had acted fraudulently, dishonestly or in bad faith, so her decision could not be overturned. She specifically asked the circuit court to address whether or not it found bad faith. In response, at the hearing on the motion to reconsider, the circuit court found that Rafalko had acted in bad faith. It also affirmed its previous decision. The circuit court entered a final order holding:

> a. That Paul D. Georgiadis and Basil D. Georgiadis, have not at any time prior to the date of this Order, engaged in any action violative of the provisions of Article VII(L)(1) of the Dimitri B. Georgiadis Trust dated August 27, 2012, as amended ("the Trust"); [and]

> b. That the determination made by Celia A. Rafalko, Trustee, as memorialized in her letter dated May 28, 2013 and the enclosed memorandum of law, that Paul D. Georgiadis and Basil D. Georgiadis had violated the provisions of Article VII(L)(1) of the Trust was made in bad faith.

It ruled that the sons and their respective descendants are the rightful remainder beneficiaries of the trust. The court awarded the sons their attorney's fees and costs pursuant to Code § 64.2-795. Rafalko filed an appeal in this Court.

6

Rafalko's assignments of error are as follows:

      1. The trial court erred in overruling the Trustee's demurrer because the [sons'] Complaint failed to allege that the Trustee acted fraudulently, dishonestly, or in bad faith when she determined that the [sons] were disqualified as trust beneficiaries.

      2. The trial court erred in finding that the Trustee's decision disqualifying the [sons] was made in bad faith, where the [sons] failed to adduce any evidence that the Trustee acted fraudulently, dishonestly, or in bad faith or abused her discretion in any way and the evidence was uncontroverted that the Trustee acted in good faith.

      3. The trial court erred in finding that the [sons'] conduct of writing threatening letters to the Trustee's lawyer and the Trust's Income Beneficiary, for the admitted purpose of convincing the Income Beneficiary to agree with them to terminate the Trust and distribute its assets in contravention of the Trust's dispositive plan, was not an "attempt to interfere with the administration of this trust according to its express terms" that disqualified the [sons] from any interest in the Trust.

      4. Because the [sons] had violated the provisions of the Trust and were properly disqualified by the Trustee, the trial court erred in awarding the [sons] their attorney's fees and costs.

ANALYSIS

Initially, we note that there is no dispute in this case over whether, even though perhaps not favored, a "no contest" clause can be enforced. No contest clauses in trusts that are part of a testamentary estate plan are given full effect, as they are in wills. Keener v. Keener, 278 Va. 435, 442, 682 S.E.2d 545, 548 (2009). Furthermore, our case law is clear that such clauses, while enforceable, are to be strictly construed. We construe a no contest clause strictly "according to its terms." Id.

When determining whether a beneficiary's actions have triggered a no contest clause, we strictly construe the language of the clause because the drafter chose the language and forfeiture is disfavored in the law. Id. at 442-43, 682 S.E.2d at 548-49. In this case, the circuit court construed a no contest clause and concluded that the actions of the sons did not violate that

7

clause. Our review of a judgment on appeal is limited to the errors assigned by the parties. Covel v. Town of Vienna, 280 Va. 151, 163, 694 S.E.2d 609, 616 (2010); see also Rule 5:17(c)(1)(i). We shall examine each of the appellant's assignments of error in order.

ASSIGNMENT OF ERROR 1

In her first assignment of error, Rafalko asserts that the circuit court erred when it overruled her demurrer because the complaint "failed to allege that the Trustee acted fraudulently, dishonestly or in bad faith when she determined that the sons were disqualified as trust beneficiaries." Rafalko notes that the trust states that a trustee's decision is final unless there is a showing of "fraud, dishonesty, or bad faith" on the part of the trustee. She argues that the circuit court erred in overruling her demurrer because the sons' complaint did not allege that she acted fraudulently, dishonestly or in bad faith when she decided that the sons violated the no contest clause and were disqualified as beneficiaries.

The sons argue that the court did not err in overruling Rafalko's demurrer. They assert that while the trustee had discretion to remove the sons as beneficiaries to the trust, she was not allowed to act arbitrarily and capriciously in exercising that discretion. In the complaint, they alleged that Rafalko's decision that they had violated the no contest clause "'relied upon an interpretation of the terms of the No Contest Clause that is arbitrary and capricious, contrary to law, contrary to the clearly expressed intent of the Grantor,' and 'in violation of the public policy of the Commonwealth of Virginia.'"

We review a circuit court's decision on demurrer de novo. Ayers v. Shaffer, 286 Va. 212, 217, 748 S.E.2d 83, 86 (2013). "To survive a challenge by demurrer, a pleading must be made with sufficient definiteness to enable the court to find the existence of a legal basis for its

8

judgment." Eagle Harbor, L.L.C. v. Isle of Wight Cty., 271 Va. 603, 611, 628 S.E.2d 298, 302 (2006) (citation and internal quotation marks omitted).

Code § 64.2-703(B)(2) states that a trust's language cannot remove "[t]he duty of a trustee to act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries."[3] See also NationsBank of Virginia, N.A. v. Estate of Grandy, 248 Va. 557, 561-62, 450 S.E.2d 140, 143 (1994) ("Generally, a trustee's discretion is broadly construed, but his actions must be an exercise of good faith and reasonable judgment to promote the trust's purpose."). A trustee's exercise of discretion can be overruled by a court if the trustee has clearly abused the discretion granted him under the trust instrument or acted arbitrarily. See id.; Hoffman v. First Virginia Bank, 220 Va. 834, 842, 263 S.E.2d 402, 408 (1980) (holding that when a trust's language gives the trustee full discretion over the investment of trust assets, "[i]n order to impose liability, therefore, it must be alleged and proved that the fiduciary acted dishonestly or in bad faith, or abused the discretion vested in it"); Rinker v. Simpson, 159 Va. 612, 621-22, 166 S.E. 546, 549 (1932) ("[W]here the trustees are … exercising [their discretion] in such an arbitrary manner, as, in effect, to make it a means of destroying the trust which it was intended to aid and maintain, a court of chancery will intervene and compel the trustees to administer the trust in a proper manner, and at the proper time.").

Thus Virginia statutes and jurisprudence provide that, notwithstanding a broad grant of discretion or one specifically limited only by bad faith, fraud or dishonesty, a court is vested with

---

[3] Notably, Code § 64.2-703(B)(11) states, "[t]he power of the court to take such action and exercise such jurisdiction as may be necessary in the interests of justice" cannot be abrogated by the terms of a trust. Thus, it appears that a court can always review a trustee's decision if the court believes it is in the best interest of justice. However, the circuit court in this case based its decision on the fact that it believed the sons alleged that Rafalko did not act in conformity with the trust language and made no finding regarding whether justice demanded it to act.

9

the authority to evaluate whether the trustee's actions were consistent with the terms and purposes of the trust and in the best interests of the beneficiaries, and if they were not, to overrule the decision of the trustee as arbitrary and an abuse of discretion.

The sons' complaint stated that Rafalko's decision that the no contest clause could be triggered with actions short of "prosecuting a legal action" was "arbitrary and capricious, contrary to law, and contrary to the clearly expressed intent of the Grantor." Further, they alleged that Rafalko's interpretation of the no contest clause such that she deemed the letters to be an "attempt to interfere with the administration of [the Trust] according to its express terms" was "arbitrary and capricious, contrary to the Grantor's intent, contrary to law, and in violation of the public policy of the Commonwealth of Virginia."

The complaint alleged that Rafalko's decision to disinherit the sons and their descendants was contrary to Dimitri's "clearly expressed intent" as articulated by the trust language. In other words, it alleged that her decision was without authority because it was contrary to the purposes of the trust and an abuse of the discretion she was afforded under the terms of the trust. Thus, judicial review of the trustee's exercise of discretion is allowed pursuant to Virginia jurisprudence and Code § 64.2-703(B)(2) to discern whether the trustee has abused the discretion vested in her by the trust or acted arbitrarily. Accordingly, the circuit court did not err when it denied the demurrer and ruled that it was proper for the court to determine whether Rafalko acted in conformity with the authority granted under the terms of the trust.

## ASSIGNMENT OF ERROR 2

In her second assignment of error, Rafalko complains that the circuit court erred in holding that the trustee's decision was made in bad faith because the sons "failed to adduce any

10

evidence that the Trustee acted fraudulently, dishonestly, or in bad faith or abused her discretion in any way and the evidence was uncontroverted that the Trustee acted in good faith."

After receiving the circuit court's letter opinion, Rafalko filed a motion to reconsider and asserted that the court had not addressed whether it found bad faith on the part of Rafalko. In direct response to Rafalko's inquiry about the issue, the circuit court ruled that Rafalko had acted in bad faith. Subsequently, the final order also contained the holding that the trustee's decision was made in bad faith.

The assignment of error presented by Rafalko challenging the circuit court's finding of bad faith by its terms raises a sufficiency of evidence challenge. We do not reverse a circuit court's factual finding that an individual acted in bad faith unless the decision was plainly wrong or not supported by the evidence. Lovitt v. Warden, 266 Va. 216, 241, 585 S.E.2d 801, 815-16 (2003) (noting that a determination of bad faith is a factual finding because it is decided based on the court's determination of the mindset of a party). In determining whether there is evidence to support the circuit court's factual finding, we are not limited to the evidence adduced by the sons. Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010); see Bratton v. Selective Ins. Co. of Am., 290 Va. 314, 322, ___ S.E.2d ___, ___, 2015 Va. LEXIS 110, at *8 (2015). We must review all of the evidence presented to the court in the light most favorable to the prevailing party. Id. A person acts in good faith when he or she acts with honest motives. Webster's Third New International Dictionary 978 (1993); Black's Law Dictionary 808 (10th ed. 2014).

In this particular instance, Paul wrote a letter to the lawyer who drafted the August trust instrument, asking him to preserve documentation because he was considering contesting the August testamentary documents. He also wrote a letter to his stepmother, asking her to consider

11

terminating the August trust and insinuated that if she did not agree with that, he and Basil would contest the August trust documents. Both letters were sent before the sons knew that the August trust documents had been superseded by the September trust which added the no contest provision and other changes to the August trust documents which made it legally impossible for the sons and their stepmother to agree to terminate the trust.

Upon learning of the no contest provision and other amendments to the trust executed in September, within three days of the January 4 letter being sent, Basil completely disavowed the January 4 letter. By the end of February, both sons had signed releases agreeing not to contest the will or trust or interfere with the trustee's administration of the trust in any way. Over three months later, Rafalko concluded that the letters written by Paul were an attempt to interfere with her administration of the trust.

The stated purpose of Article L, which included the no contest clause and a provision for releases to be sent to the beneficiaries, was to "eliminate the possibility that a beneficiary would challenge the Trust." Upon notification of the existence of Article L and upon being presented with the releases required to be sent to them, the sons expressed their desire not to challenge the trust in any way and executed the releases. After the releases were signed, the intent of the no contest and release clauses was accomplished. The possibility that the beneficiaries would challenge the trust had been eliminated without litigation.

However, the trustee thereafter used the trust proceeds to spend three months collecting information and consulting attorneys and others concerning whether the actions taken by the sons, before they knew of the no contest clause, could possibly be considered a challenge to the trust or an attempt to interfere with the administration of the trust.

12

At trial, Rafalko offered into evidence several emails showing exchanges between the sons and their father after the sons found out that they would no longer be receiving a distribution from the trust upon their father's death. The emails say unflattering things about Dimitri, Margaret and Rafalko, including an accusation that Dimitri believed impugned Rafalko's honesty. Rafalko argued that the sons were "horrible people" even though neither the emails nor the sons' behavior toward their father was relevant to whether the no contest clause had been violated.

Rafalko admitted that the named beneficiaries stood to gain nothing by her pursuing whether the letters violated the no contest clause, after the sons had signed releases of all claims and the stated purpose of Article L had been accomplished. Also, Rafalko had been told that declaring the sons in violation of the no contest clause based upon the January letters would result in a legal "dogfight" that would no doubt cost the estate some expense. Additionally, it was revealed through evidence at trial that if the sons were eliminated as beneficiaries, the remainder of the trust would be left for distribution at Rafalko's discretion pursuant to the terms of the trust. There is sufficient evidence upon which a court could determine that Rafalko's decision to find the sons in violation of the no contest provision was not motivated by a desire to carry out the testator's intent or to protect the beneficiaries and was therefore done in bad faith.

Even if there was no evidence to support the circuit court's finding of bad faith, this assignment of error does not require reversal. As explained above, the circuit court's decision was grounded on its determination that the letters sent by the sons to Margaret and Dimitri's attorney concerned the trust as it existed on August 27, 2012. In its letter opinion, the circuit court, construing the no contest provision narrowly, clearly stated that the no contest provision which prohibited interference with "this trust agreement and any provisions made in 'this trust

13

agreement,'" meant that the applicability of the no contest clause was restricted to challenges directed to the September trust documents. (Emphasis in original.) Accordingly, the circuit court concluded that "[t]here was no prohibition against challenging any prior agreement or the trust agreement as written in 1989 or August 27, 2012." (Emphasis added.) This was the reason for the circuit court's determination that the sons' actions did not violate the no contest provision.

Rafalko's second assignment of error does not challenge the operative holding of the circuit court – that the sons' actions did not amount to a contest because the no contest provision only applied to challenges aimed at the testamentary documents in place on September 21, 2012. At best, the finding of bad faith by the circuit court was an alternative or additional ground for the circuit court entering judgment in favor of the sons, in addition to the trustee acting arbitrarily or abusing her discretion by misapplying the terms of the trust.

In summary, we reject Rafalko's second assignment of error because the record supports the circuit court's determination of bad faith. We also reject this assignment of error because there is no challenge to the primary holding by the circuit court that the no contest provision contained in the September 2012 testamentary document applied only to challenges directed against that document and that the sons' actions were directed only to the August 2012 testamentary document, and therefore there was no interference with or contest to the September 2012 testamentary document. This alternative ground remains an independent ground for the circuit court's judgment.

### ASSIGNMENT OF ERROR 3

In her third assignment of error, Rafalko claims that the circuit court erred in holding that the sons' letters, written "for the admitted purpose" to convince Margaret to agree to "terminate

14

the trust and distribute its assets in contravention of the Trust's dispositive plan, was not an 'attempt to interfere with the administration of this trust according to its express terms' that disqualified the sons from any interest in the trust."

The holding of the circuit court was that the actions of the sons were specifically directed to the August 2012 testamentary documents and the no contest provision only applied to challenges directed to the testamentary documents existing as of September 2012. Accordingly, this assignment of error, like the previous assignment of error, does not address the circuit court's construction of the no contest clause, which formed the basis of its conclusion that the no contest clause was not violated. Failure to assign error to the substantive ruling of the circuit court precludes consideration of whether that ruling was correct.

Nevertheless, considering the trustee's arguments does not dictate a different result. "The question whether a no-contest clause in a [trust] has been triggered presents, on appellate review, a mixed question of law and fact." Keener, 278 Va. at 441, 682 S.E.2d at 548. Whether particular conduct "constitutes a contest or attempt to defeat a will depends on the wording of the 'no contest' provision and the facts and circumstances of each particular case." Womble v. Gunter, 198 Va. 522, 529, 95 S.E.2d 213, 219 (1956). "Accordingly, [this Court] accord[s] deference to the circuit court's findings of historical fact, but review[s] questions of law de novo." Keener, 278 Va. at 441, 682 S.E.2d at 548.

The trustee maintains that the sons attempted to interfere with the administration of the trust when they sent the letters to Guare and Margaret. According to the trustee, the letters evidenced the sons' clear intent "to bring about the termination of the trust," which would have "directly contravened the trust's express terms." Therefore, she claims that the letters constituted an attempt to interfere with the trust's administration.

15

The terms of the no contest clause that Rafalko claims the letters violated prohibit "an attempt in any way to interfere with the administration of this trust according to its express terms." A no contest clause should be strictly enforced according to its terms. Keener, 278 Va. at 442, 682 S.E.2d at 548. We have stated that no contest clauses are strictly construed for two reasons. First, the testator or skilled draftsman acting at his direction has the opportunity to select the language that will most precisely express the testator's intent. See Womble, 198 Va. at 531-32, 95 S.E.2d at 220-21. Second, provisions that require forfeiture are not favored in the law generally and will not be enforced except according to their clear terms. See Trailsend Land Co. v. Virginia Holding Corp., 228 Va. 319, 323-24, 321 S.E.2d 667, 669 (1984).

The no contest clause in this case does not prohibit discourse related to proposed conduct, even if actually undertaking that conduct would be prohibited. Construing this clause narrowly, as we must, it only prohibits actual attempts to interfere with the administration of the trust. Proposing actions whose goal, if accomplished, may interfere with the administration of the trust is not prohibited. Evidence that the sons "cherished a desire" to terminate the trust is not "sufficient to bring them under the ban of this clause." See Puller v. Ramsey, 200 S.W. 83, 87 (Mo. Ct. App. 1918).

The trustee is charged with the administration of the trust and her responsibilities of administration are set forth in the trust. They include: dividing Dimitri's assets into the marital and family trusts; distributing income; paying debts; making productive use of Dimitri's property; allocating assets in the best interests of the beneficiaries; and dividing property into equal shares for distribution to Dimitri's descendants. Dimitri also incorporated by reference the

16

numerous powers set forth in Code § 64.2-105.[4]  These are the "express terms" of the trust

regarding its administration that Dimitri wanted free from interference.

The sons took no action that can be characterized as an attempt to interfere with the

administration of the trust.  Neither letter sent by the sons implicate any of the trustee's powers

of administration or affect her ability to exercise those powers.  First, as the sons alleged in their

complaint, neither letter was sent to the trustee herself.  One was sent to a fellow beneficiary,

Margaret, and the other was sent to Dimitri's former attorney who prepared the trust documents.

The trustee fails to explain how words stated to third parties about a previous version of the trust

could interfere with her administration of the trust.

Moreover, neither letter necessitated any action by the trustee, affected the trust's

administration, or even attempted to do so.  In their letter to their stepmother, the sons expressed

their discontent with the terms of the trust and indicated their interest in a non-judicial settlement

pursuant to Code § 64.2-709.  Regardless of whether the ultimate realization of their proposal

could ever interfere with the administration of the trust, the sons did not pursue this matter

further.[5]

In the letter to Guare, the sons merely instructed him to retain relevant documents

because a legal contest was likely.  Again, this action had no effect whatsoever on the trustee's

administration of the trust "according to its express terms."  Telling Dimitri's former lawyer to

retain documents did not interfere, or attempt to interfere, with any of the trustee's powers of

administration as set forth in the trust and Code § 64.2-105.  The letter accomplished nothing

---

[4] The trust identifies Code § 64.1-57, the predecessor to Code § 64.2-105.

[5] Moreover, because the September amendment added a charitable contingent beneficiary, the stated goal of the letter was an impossibility, as the trustee noted in her decision memorandum.  See Code § 64.2-709.

more than the preservation of evidence at a time when the sons were evaluating their rights and remedies respecting their father's estate. When the sons learned of the no contest clause, the provision had its intended prophylactic effect and the sons committed no further action in preparation for a contest. See Lavine v. Shapiro, 257 F.2d 14, 19 (7th Cir. 1958) ("Plaintiff . . . had a right to express her feeling of hostility as well as her opinion of defendant in any way, at any place, at any time she saw fit, without being vulnerable to the charge that she directly or indirectly aided in the contest of the will."); Estate of Wojtalewicz v. Woitel, 418 N.E.2d 418, 421 (Ill. App. Ct. 1981) (allowing a legatee a "right to express a feeling of hostility toward and an opinion of the executor [as] he sees fit" without forfeiting his interests).

A trustee has discretion to determine if the terms of a trust have been violated but not the discretion to define those terms as he or she sees fit. Rinker, 159 Va. at 621-22, 166 S.E. at 549. A court must ensure that the trustee remains true to the intent of the testator as those intentions are expressed in the text of the trust.

Accordingly, the record supports a conclusion that the letters at issue did not interfere with the trustee's administration of the trust, and should not have resulted in the disqualification of the sons as beneficiaries. Additionally, the assignment of error does not address the holding of the circuit court that the no contest clause only applies to challenges directed at the September 21, 2012 trust documents. Therefore we decline to reverse the circuit court on this assignment of error.

### CONCLUSION

In summary, for the reasons stated we affirm the judgment of the circuit court finding that there was no error in denying the trustee's demurrer. We also affirm the circuit court's judgment that Paul D. Georgiadis and Basil D. Georgiadis and their respective descendants are rightful

beneficiaries of the trust, subject to all provisions of the trust, because no assignment of error challenged the circuit court's holding that the no contest clause in the September 2012 testamentary documents only prohibited challenges directed to those testamentary documents, and therefore there is an unchallenged alternative basis for the circuit court's judgment.[6] Accordingly, we also affirm the circuit court's judgment awarding the sons' attorneys' fees and costs in the amount of $45,977.58.[7] Furthermore, even considering the second and third assignments of error, we conclude that the record supports the circuit court's judgment.

Affirmed.

JUSTICE MIMS, dissenting.

I disagree with the majority's conclusion that no assignment of error challenges the circuit court's ruling that the no-contest clause applied only to the changes made in the September 2012 amendment. To the contrary, I believe the trustee presents that challenge in her third assignment of error. I also disagree with the majority's conclusion that the evidence supports the circuit court's judgment that the trustee's decision to disqualify Paul and Basil Georgiadis ("the sons") for violating the no-contest clause was improper. Accordingly, I disagree with the majority's decision to affirm the circuit court's awarding attorney's fees to the sons. I therefore respectfully dissent.

Initially, I must address the sons' assignment of cross-error in which they assert that the September 2012 amendment violates Code §§ 64.2-703(B) and 64.2-777(B). This is a threshold issue because it broadens the scope of the circuit court's review of the trustee's decision. Article

---

[6] In light of our holdings, we need not address the assignments of cross-error.

[7] The trustee assigned error to this award based only on the theory that the sons had violated the terms of the trust.

19

VII(L) of the trust agreement as amended by the September amendment provides that "[a]bsent proof of fraud, dishonesty, or bad faith on the part of my Trustee, the decision of my Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets [under the no-contest clause] shall be final." The parties agree that the plain language of this provision bars any challenge to a decision by the trustee to apply the clause to disqualify a beneficiary unless the challenge is based on one of the three specified grounds. However, the sons argue that this restriction is too narrow and is not permitted by the statutes. I agree.

We review questions of statutory interpretation de novo. Roop v. Whitt, 289 Va. 274, 278, 768 S.E.2d 692, 694-95 (2015). The grantor of a trust in Virginia may not exempt a trustee from the fiduciary duties imposed by statute. Code § 64.2-777(B) expressly states that a trustee's exercise of power under a trust is subject to the statutory fiduciary duties. Those duties include administering the trust and investing its assets in good faith, Code § 64.2-763, so administration of the trust in bad faith is necessarily a breach of fiduciary duty. However, the statutory fiduciary duties are broader than mere bad faith or the two other grounds set forth in the trust agreement for challenging the trustee's decision to disqualify a beneficiary.

As an illustrative, non-exclusive example of these statutory fiduciary duties, Code § 64.2-765 imposes a duty of impartiality. Partiality cannot be simply a form of bad faith because that would make Code § 64.2-765 duplicative of Code § 64.2-763. Such an interpretation violates our canons of construction. Owens v. DRS Auto. Fantomworks, Inc., 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014) ("We adhere to rules of statutory construction that discourage any interpretation of a statute that would render any part of it useless, redundant or absurd.") The same reasoning applies to the other statutory fiduciary duties. Yet the trust agreement does not appear to permit a beneficiary to challenge a trustee's decision that he or she is disqualified on

20

the ground that such a decision was not impartial, or breached any other statutory fiduciary duty. To the extent that the trust agreement purports to restrict a beneficiary's ability to do so, the agreement is superseded by law. Code § 64.2-703(B)(11). Accordingly, the trust agreement may not limit the sons' ability to challenge the trustee's decision solely on the bases of fraud, dishonesty, or bad faith.

Turning to the trustee's assignments of error with this standard in mind, I note that she first asserts that the circuit court erred by overruling her demurrer to the sons' complaint because they did not allege any of the three grounds set forth in the trust agreement as the basis for challenging her decision to disqualify them. When reviewing a circuit court's ruling on a demurrer, "we consider as true all the material facts alleged in the complaint, all facts impliedly alleged, and all reasonable inferences that may be drawn from such facts." Assurance Data, Inc. v. Malyevac, 286 Va. 137, 143, 747 S.E.2d 804, 807 (2013) (internal quotation marks and alteration omitted).

The sons' complaint recites the statutory "fiduciary duties of good faith and fair dealing, loyalty, impartiality, [and] prudent administration" and asserts that the trustee's interpretation of the no-contest clause was "contrary to law, and in violation of the public policy of the Commonwealth of Virginia." These allegations imply that the trustee's decision was a breach of fiduciary duty, which is a question of fact. Williams v. Dominion Tech. Partners, L.L.C., 265 Va. 280, 290, 576 S.E.2d 752, 758 (2003). Thus, in light of the statutory limitations on trust provisions imposed by Code § 64.2-703(B)(11) and 64.2-777(B), the complaint was sufficient and the circuit court did not err by overruling the trustee's demurrer. Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) ("When the trial court has reached the correct

21

result for the wrong reason, but the record supports the right reason, we will assign the correct reason and affirm that result." (internal quotation marks omitted)).

Nevertheless, as the trustee asserts in her second assignment of error, the sons failed to prove a breach of fiduciary duty at trial. A circuit court's factual findings "will be reversed on appeal only if such findings are plainly wrong or without evidence to support them." Specialty Hosps. of Wash., LLC v. Rappahannock Goodwill Indus., 283 Va. 348, 354, 722 S.E.2d 557, 559 (2012). The sons, as the prevailing parties below, are "entitled to have the evidence and all inferences reasonably drawn from it viewed in the light most favorable to" them. RGR, LLC v. Settle, 288 Va. 260, 283, 764 S.E.2d 8, 21 (2014).

The circuit court accepted the trustee's argument that the trust agreement required any challenge to her decision to be based only on fraud, dishonesty, or bad faith, and concluded that she had acted in bad faith. As noted above, administering a trust in bad faith is a breach of fiduciary duty. Code § 64.2-763. But the record includes no evidence supporting such a finding, or that the trustee breached any other statutory fiduciary duty. The evidence indicated that the trustee had been a friend of the sons' father (the grantor) and step-mother and included letters and emails in which the sons disparaged their father, their step-mother, and the trustee. The trustee testified that these communications—or so many of them as the sons' father received while he lived—upset him.

However, these facts do not establish any breach of fiduciary duty by the trustee, nor do they support a reasonable inference of such a breach. To the contrary, the trustee testified that she sent the sons copies of the trust documents as quickly after their father's death as she could gather the documents, identify who was entitled to them, and make and send copies. She sent them on January 3, 2013, sooner than required by law. Code § 64.2-775(B). Coincidentally, that

22

day, scarcely a month after his father's death, was the same day Paul mounted his assault on the trust by informing their father's attorney that it would be contested. The next day, Paul wrote his step-mother that the trust would be challenged if she did not agree to divide its assets equally between her and the sons.

As soon as the trustee learned of Paul's letters, she met with counsel. She did not discuss the letters with the step-mother or ask her opinion of whether the letters violated the no-contest clause. The trustee testified that her decision to disqualify the sons was based solely on Paul's letters and the legal advice of counsel. She expressly denied that her decision was tainted by her knowledge that the sons' communications had upset their father before he died. She testified that the decision was a difficult one for her because of its "far reaching implications." Nevertheless, she believed it was not her place as trustee to determine whether the outcome was fair, but whether the trust agreement compelled it. Neither the trustee nor the step-mother benefited from the trustee's decision. While the trustee's counsel referred to the sons as "horrible" in closing argument, there is no indication that was the trustee's personal view of them, or even if it was, that she had formed that view before reaching her decision.

In considering whether the sons violated the no-contest clause, the trustee was required by law to make a neutral assessment of whether Paul's letters and the sons' actions constituted a "direct[] or indirect[]" "challenge or contest" to the trust agreement, "by legal proceedings or otherwise." She bore a statutory burden of impartiality with regard to the sons and the contingent beneficiaries (who would share in the trust assets in their place if the sons violated the clause). Code § 64.2-765; see also Sturgis v. Stinson, 241 Va. 531, 534-35, 404 S.E.2d 56, 58 (1991) ("Under general trust law principles, where, as here, a trust is created for successive beneficiaries, the trustee has a duty to deal impartially with them."). The record reflects that she

discharged this burden responsibly after deliberation and consultation with counsel, and dutifully compared what the sons did to what the clause forbade. There is simply no evidence that she bore antipathy toward the sons or that it clouded her judgment. Likewise, is there no trace of bad faith, partiality, or any other breach of her statutory fiduciary duties in the record.

In her third assignment of error, the trustee asserts that the circuit court erred by interpreting the no-contest clause to prohibit challenges only to the September 21, 2012 amendment rather than the trust agreement as amended and restated on August 27, 2012 as a whole.[*] I agree.

We interpret the provisions of a trust agreement de novo. Riverside Healthcare Ass'n v. Forbes, 281 Va. 522, 528, 709 S.E.2d 156, 159 (2011); see also Schuiling v. Harris, 286 Va. 187, 192, 747 S.E.2d 833, 836 (2013) (noting that we "'have an equal opportunity to consider the words of [an agreement] within the four corners of the instrument itself" (internal quotation marks omitted)). The circuit court ruled that the words "this trust agreement" as used in the September amendment applied only to that amendment itself rather than to the entire trust agreement as amended and restated on August 27, 2012. However, the September amendment is not a trust agreement. Standing alone, it contains none of the elements required to create a trust. Massanetta Springs Summer Bible Conference Encampment v. Keezell, 161 Va. 532, 541, 171 S.E. 511, 514 (1933) (noting that an enforceable trust agreement "must be certain and definite in

---

[*] The majority opinion recites the text of this assignment of error in full. In my view, that text "point[s] out the errors with reasonable certainty in order to direct this court and opposing counsel to the points on which the appellant intends to ask a reversal of the judgment." Findlay v. Commonwealth, 287 Va. 111, 115, 752 S.E.2d 868, 871 (2014) (internal quotation marks and alteration omitted). It is sufficient to challenge both the circuit court's evidentiary finding that the sons' conduct did not violate the no-contest clause and its legal ruling that the no-contest clause applied only to challenges to the September 2012 amendment, rather than the August 2012 amendment and restatement. The trustee makes both arguments on brief, as she did in her petition for appeal.

24

respect to the objects or persons who are to take, and also in respect to the subject matter thereof" (emphasis omitted)). Consequently, the words "this trust agreement" as used in the September amendment must refer not to that amendment alone but to that amendment together and collectively with the August 27, 2012 trust agreement it amends.

In her fourth assignment of error, the trustee asserts that the circuit court erred by awarding the sons' attorney's fees. I agree.

Code § 64.2-795 permits a court to award attorney's fees, costs, and expenses "as justice and equity may require." "We review the circuit court's decision to award attorney's fees for an abuse of discretion." Piney Meeting House Invs., Inc. v. Hart, 284 Va. 187, 196, 726 S.E.2d 319, 324 (2012). A court abuses its discretion when it commits a clear error of judgment. Shebelskie v. Brown, 287 Va. 18, 26, 752 S.E.2d 877, 882 (2014).

The circuit court's award of attorney's fees in this case was predicated on its conclusion that the trustee's decision to disqualify the sons based on the no-contest clause was improper. Because that conclusion was incorrect, the court committed a clear error of judgment in awarding the sons' attorney's fees.

Finally, in their first assignment of cross-error, the sons assert that the circuit court erred by finding that their conduct was sufficient to violate the no-contest clause, because only a legal action constitutes a challenge to the trust agreement. I disagree.

As the sons acknowledge, we have upheld no-contest clauses to "effectuate the [grantor's] legitimate interest in preventing attempts to thwart his intent." Virginia Found. of Indep. Colleges v. Goodrich, 246 Va. 435, 438, 436 S.E.2d 418, 420 (1993). They likewise acknowledge that we enforce no-contest clauses "according to their clear terms." Keener v. Keener, 278 Va. 435, 443, 682 S.E.2d 545, 548-49 (2009).

25

The no-contest provision in this case clearly prohibits a beneficiary from "directly or indirectly" "challeng[ing] or contest[ing]" the trust agreement, "by legal proceedings or otherwise." (Emphasis added). The sons' argument would render the words "or otherwise" meaningless, contravening the clear terms of the no-contest clause.

Further, Paul's January 3 letter to his father's attorney stated that the trust "will be the subject of a contest." (Emphasis added.) Similarly, his January 4 letter to his step-mother threatened that if she did not accept the sons' proposal to disregard the trust and divide its assets equally between them, they "would be moving to have the [c]ourt recognize [their father's] long-established will and trust in place for over 23 years as against the current will and trust in place only in the last three months of his life." No clearer evidence of their intent to thwart their father's wishes as expressed in the trust agreement is required.

Accordingly, I would reverse the judgment of the circuit court and remand for further proceedings to determine whether the trustee or the trust should be awarded attorney's fees, costs, and expenses under Code § 64.2-795.

JUSTICE KELSEY, with whom JUSTICE McCLANAHAN joins, dissenting.

The majority treats this case as a routine abuse-of-discretion review of a trustee's actions and, even in that context, affords rather nominal deference to the trustee. But that is not the proper paradigm. The settlor specifically intended his trustee's determination — in the limited context of the no-contest provision — to be "final" in the absence of a showing of "fraud, dishonesty, or bad faith on the part of [the] Trustee." J.A. at 299. No such showing has been made in this case. The underlying question in this case is not whether the no-contest provision was violated. It is who gets to make that call. Absent egregious circumstances, the settlor of this trust intended his trustee — not the litigation machinery of the court system — to umpire this

26

dispute. I believe settled principles of trust law affirm, not disaffirm, the settlor's clearly articulated intent.

I.

In 1989, Dimitri Georgiadis established a revocable trust for his wife, making her an income beneficiary and naming his two sons from a prior marriage, Paul and Basil, as remainder beneficiaries. The trust agreement initially appointed the two sons as co-trustees.

On August 27, 2012, the father "amend[ed] and restate[d] the Trust Agreement in its entirety." Id. at 278. The restatement removed the two sons as co-trustees, named the father "to serve alone as [his] Trustee" during his lifetime, id., and designated his financial advisor, Celia Rafalko, as the successor trustee, effective upon his "resignation, incapacity or death," id. at 289. The restatement also made a larger portion of the trust corpus available to his wife in time of need, while leaving the remainder of the trust to the sons upon her death. See id. at 279-82. One of the two sons, Paul, who is an attorney, was present at the execution of the restatement.

After the August 2012 restatement, the sons began a campaign to undo the changes to the trust. They wrote letters and emails and left messages on their father's voicemail. Basil wrote his father complaining that their stepmother, the income beneficiary of the trust, "will have won the lottery" when he dies. Id. at 316. The closing lines of a letter from Paul to his father reads: "So much for loyalty to your own blood and fair play from Step-Mum. Dad, I have NOTHING more to say about this and won't debate it with your [sic] or discuss it with [your wife]. Your actions speak volumes." Id. at 306 (capitalization in original).[1] In another email he warned,

---

[1] Paul wrote the email on behalf of himself and his brother and forwarded it to Basil. "You have accurately and eloquently summarized the situation without emotion," Basil told his brother in response. J.A. at 310. "Your words are clear and true. Well-said Brother." Id. The trial court, following a bench trial, made a factual finding that "Basil Georgiadis is bound by the letters because he agreed with the contents and authorized them to be sent by his brother." Id. at

27

"[Y]ou cannot insist that we happily accept this and get along.  I do not and will not."  Id. at 309.

Another email from Basil lamented, "To pretend that we are happy with your actions or that we are one big happy family would be a falsehood. . . .  I will forever be disturbed by your actions." Id. at 317.

The father was greatly upset by the reaction of his sons.  One of his emails reminded them that he "always treated [them] with consideration, generosity and courtesy" and had "never lied" to them.  Id. at 314.  He pointed out that their stepmother had been his "lifetime partner, over several decades and has consistently and faithfully shown complete loyalty and support to [him] and [his] family."  Id.  Their views of her, the father declared, "are unfounded and totally unwarranted."  Id.  If they continued to ignore his wishes, he flatly said:  "I will be very angry as you impugn my character.  Remember also that no one has any entitlements of any kind and if I so desire I can bequeath whatever I wish to whomever I wish."  Id.  The father ended the email by telling his sons that they created "this nasty and regrettable situation."  Id.  Whether the family remained "intact," he said, "is now up to you two."  Id.

Shortly thereafter, on September 21, 2012, the father amended the trust (as restated on August 27, 2012) to include a no-contest provision, which states:

> Absent proof of fraud, dishonesty, *or* bad faith on the part of my Trustee, if any beneficiary or potential beneficiary under this trust agreement shall directly *or* indirectly, by legal proceedings *or* otherwise, challenge *or* contest this trust agreement *or* any of its provisions, *or* shall attempt in any way to interfere with the administration of this trust according to its express terms, any provision I have made in this trust agreement for the benefit of such beneficiary *shall be revoked* and the property that is the subject of such provision shall be disposed of as if that contesting beneficiary and all of his or her descendants had predeceased me. Absent proof of fraud, dishonesty, *or* bad faith on the part of my

---

125. On appeal, the sons have waived any challenge to this finding.  Appellee's Br. at 4 n.3.

28

> Trustee, the decision of my Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets under this provision *shall be final*.

Id. at 299 (emphases added).

Another provision of the September 2012 amendment provided that, after the father died, his sons could not receive anything from the trust unless they executed a release of liability warranting that they would not sue the trustee, the personal representative of the father's estate, the father's attorneys in fact, or any other beneficiary under the trust. If either brother failed to execute the required release, that son's share "shall be revoked" by the trustee. Id. at 299-300. The September 2012 amendment to the trust also created a new class of contingent remainder beneficiaries, charitable organizations recognized under the Internal Revenue Code, to replace the sons as remainder beneficiaries in the event that the trustee determined that they violated the no-contest or release provisions.

The father died on December 3, 2012. At the time of his death, he had been married to his wife for 23 years. On January 3, 2013, Paul wrote to the attorney who had drafted the August 2012 restatement and who had served as the trustee's initial legal counsel, declaring that "the testamentary documents purportedly executed in your office on or about August 27, 2012 by my late father" — which replaced the sons as co-trustees with their father's financial advisor as successor trustee and increased their stepmother's ability to use the corpus of the trust during times of need — "will be the subject of a contest." Id. at 293. He made this threat with the agreement of his brother, Basil.

A day after announcing that the trust "will be the subject of a contest," id., Paul wrote a letter to his stepmother, at Basil's urging, see id. at 233-34, attempting to persuade her to terminate the trust outright and to agree to the immediate conveyance of two thirds of the trust assets to him and his brother. The letter asked for her agreement to the sons' desire "that the

29

trust be set aside and dissolved." Id. at 294. If she failed to capitulate, leaving the sons "forced to contest" their father's trust and will, Paul warned his stepmother that she "would lose a substantial share of [her] income," that Basil and he "would take the $5.1 million distribution," and that, upon her death, Basil and he "would still take the remainder." Id. at 295. Paul added that he would "not belabor the legal issues of undue influence and lack of testamentary capacity," given that he and his brother would "save [their] arguments for the Court and jury if needed." Id. Paul gave his widowed stepmother ten days to respond in writing to his threats, "[s]o that no one has to incur needless legal expenses." Id.

The attorney who drafted the September 2012 amendment retained the document in his office and did not provide it to the trustee until December 12, 2012. Upon her receipt of the document, the trustee promptly forwarded it to the sons. In response, legal counsel for Paul wrote the trustee's counsel stating that the sons were unaware of the no-contest provision and that, in any event, he did not believe that they had violated it. Paul merely wanted, counsel argued, "to introduce the concept of a non-judicial settlement agreement" for their stepmother's consideration. Id. at 304. Paul's counsel admitted that Paul's January 3, 2013 letter "can be fairly said to be a threat" but, counsel contended, it was "nothing more." Id. at 305. Paul's counsel verbally warned the trustee's counsel that the trustee would "be in for a dogfight" if she attempted to enforce the no-contest provision. Id. at 58.

Faced with an apparent violation of the no-contest provision of the trust, the trustee asked legal counsel to advise her on the proper course of action. The trustee's counsel investigated the matter and issued a lengthy legal memorandum opining that the sons had violated the no-contest provision of the trust. After seeking legal counsel from the amendment's drafting attorney, reviewing her independent counsel's legal opinion, and considering the arguments made by the

30

sons and their counsel, the trustee informed the sons that she had made her own independent determination that, in fact, both of them had violated the no-contest provision of the trust.

The sons responded by filing suit to contest the trustee's determination. Their complaint characterized the September 2012 amendment as a "revo[cation] by a subsequent will and trust" rather than a mere amendment to the August 2012 restatement. Id. at 2.[2] They argued that the trustee misinterpreted the no-contest provision in an "arbitrary and capricious" manner "contrary to both the Grantor's intent as well as the laws and public policy of the Commonwealth of Virginia." Id. at 3. They also contended that the no-contest provision, properly interpreted, only applies when the contestant initiates actual legal proceedings and does not apply as a matter of law to anything short of that.

The trustee responded by demurrer, pointing out that the complaint failed to mention, much less take into account, that the no-contest provision expressly delegated the final determination to the trustee: "Absent proof of fraud, dishonesty, or bad faith on the part of [the] Trustee," the clause emphasized, "the decision of [the] Trustee that a beneficiary or potential beneficiary is not qualified to take a share of the trust assets under this provision shall be final." Id. at 66-68; see also id. at 299. Because the sons did not allege fraud, dishonesty, or bad faith, the trustee contended, her determination should be deemed final.

The trustee also addressed the sons' argument that nothing short of filing legal proceedings could violate the no-contest provision. By its own terms, she argued, the provision

_____

[2] According to the language of the September 21, 2012 trust amendment, however, it did nothing other than "amend" the August 27, 2012 restatement of the trust agreement. J.A. at 298. The September amendment otherwise affirmed all unaffected portions of the August restatement, explicitly stating, "In all respects not hereinabove altered, the [August 27, 2012] Trust Agreement is hereby *ratified and confirmed*." Id. at 300 (emphasis added). Settlors of revocable trusts may revoke (and restate entirely) or amend the trust agreement "[b]y substantial compliance with a method provided in the terms of the trust." Code § 64.2-751(C)(1).

31

applied when any beneficiary shall "directly *or* indirectly, by legal proceedings *or* otherwise, challenge *or* contest this trust agreement *or* any of its provisions, *or* shall attempt in any way to interfere with the administration of this trust according to its express terms." Id. at 67 (emphases added); see also id. at 299.

In their opposition to the demurrer, the sons conceded that they did not plead fraud, dishonesty, or bad faith by the trustee. They said a "specter of bad faith" may be present, but they were not attempting to plead or prove bad faith because, to obtain a court order nullifying the trustee's determination, it was "enough" for them "to simply establish that the Trustee 'got it wrong.'" Id. at 74. They "were not required to establish bad faith," the sons reasoned, because the issue was merely "whether the Trustee had properly interpreted the Trust's terms." Appellees' Br. at 2-3. With respect to the disjunctive clauses of the no-contest provisions, the sons argued that the court should find them overly broad and thus unenforceable.

At the demurrer hearing, the sons' counsel contended that the trustee's argument "entirely misses the point." J.A. at 147. "We don't have to establish bad faith. We don't have to establish fraud [or] dishonesty," counsel contended. Id. at 149. If the court disagrees with the trustee's interpretation of the no-contest provision, they argued, it may do so without any pleading or proof that the trustee acted in bad faith. Without elaboration, the court denied the demurrer and set the matter on the docket for a later bench trial.

At trial, both sons testified. Neither accused the trustee of fraud, dishonesty, or bad faith. See id. at 169-91 (testimony of Paul), 192-201 (testimony of Basil); see also id. at 232 (deposition transcript of Paul read into the record). They acknowledged the letters and emails sent to their father before his death and attempted to justify their displeasure with their father's trust and will. The trustee moved to strike the evidence "on the grounds that they have not put

32

on any evidence whatsoever of bad faith or fraud, dishonesty at all." Id. at 202. The sons'

counsel replied: "I thought we kind of got through this on the demurrer." Id. When the trial

court asked the sons' counsel, "Well, ultimately, what do you want me to decide as far as the

trustee is concerned in this case?" Id. Counsel responded, "Did she get it right?" Id. at 203.

After the trial court denied the motion, the trustee presented her evidence. The trustee

testified that she was a professional investment and wealth manager. She had no self-interest in

any aspect of the trust distribution. She did not receive a copy of the September 2012

amendment to the trust until more than a week after the father had passed, but she nonetheless

forwarded copies to the beneficiaries after she was able to "collect all the information, get all the

documents, make copies," locate "all the names of the [beneficiaries]" entitled to receive copies,

and "send them out." Id. at 207. The trustee sent out the notice required under the Virginia

Uniform Trust Code, as well as copies of the September amendment to the trust, a full month

before the notice date required by statute. See Code § 64.2-775(B)(3) (requiring a trustee to

provide a statutory notice within 60 days of a revocable trust becoming irrevocable at the

settlor's death and giving beneficiaries an opportunity to request copies of the trust agreement).

The no-contest provision, she explained, expressly placed on her shoulders the duty to

apply its terms and to make a final determination. She consulted with the attorney who had

drafted the amendment, she hired independent legal counsel to advise her on the subject, and she

requested input from the sons and considered all information they provided to her. The trustee

said that her deliberations "took a couple of months," but in the end, "the decision itself seemed

very straightforward." Id. at 211.

The trustee said that she never discussed the situation with the stepmother or "ever

ask[ed] her" for input. Id. at 210. The stepmother, as income beneficiary, stood to gain nothing

33

from the trustee's determination. The consequences of the trustee's determination implicated only the primary remainder beneficiaries (the sons) and the contingent remainder beneficiaries (the charitable organizations that would later be named). When asked on cross-examination if she thought there was an overriding "fairness" issue for her to resolve, the trustee responded: "I am not in the position of deciding what's fair. I'm in the position of deciding what the trust tells me to do." Id. at 214.

After the trustee's counsel completed her case-in-chief, the sons' counsel in his rebuttal case called Paul to the stand "on the issue of bad faith." Id. at 235. When Paul stated that the trustee's decision was "flawed by bad faith," the trial court interrupted, "he's not going to argue this case." Id. at 237. If counsel "want[ed] to ask him something factually that I've heard in evidence," the judge stated, "I'll be happy to allow you to do that." Id. When the sons' counsel could not come up with any factual questions to ask, the trustee's counsel objected to Paul's testimony. The court shut the rebuttal case down, characterizing it as simply "legal argument." Id.

In closing argument, the court invited the sons' counsel to address a distinction not raised in the pleadings, testimony, or argument. "Let's assume," the court stated, that the sons were "attacking the trust." Id. at 241. "[W]hat is your position on what he was attacking, if anything?" Id. at 242. When counsel did not get the gist of this question, the court put the question more plainly: "Can he contest the trust agreement as amended in September . . . when he didn't even know what it was?" Id. After the sons' counsel agreed and implied that he had made this very distinction earlier, the court stated: "So it would be your contention, if — and I understand your position is he was not, but if he was, that he was contesting the trust agreement

34

made on August 27 . . . [n]ot the trust agreement with the amendment." Id. at 242-43.

"Exactly," the sons' counsel responded. Id. at 243.

In its letter opinion following the trial, the court invalidated the trustee's determination under the no-contest provision. On three significant points, however, the court agreed with the trustee. First, the court held as a matter of law that the "fact that neither brother was aware of the [no-contest] provision is not dispositional." Id. at 125. Second, the court concluded that the letters written to the trustee's counsel and to the stepmother constituted a prohibited contest under the no-contest clause. Id. ("The Court concludes that the aforesaid letters were as enumerated in the 'no-contest' provision."). Third, the court held the sons acted in concert with each other. The contesting actions of one, therefore, would be imputed to the other.

Despite these findings, the trial court ruled in favor of the sons. In doing so, the court relied exclusively on the theory that it had raised during closing argument with the sons' counsel. The court reasoned that the sons' contest of the trust did not target the trust as it existed at the time of their challenge. Their post-September 2012 actions were directed only at the un-amended August 2012 restatement of the trust. The no-contest provision, the court concluded, only applied to contests directed solely at the September 2012 amendment, which added the no-contest and release provisions. Applying this logic, the court held: "There was no prohibition against challenging any prior agreement or *the* trust agreement as written in 1989 or August 27, 2012." Id. at 125 (emphasis in original).

The trustee's counsel filed a motion for reconsideration, arguing that the court had misquoted the no-contest provision.[3] Later during the hearing, when discussing an award of

---

[3] The trial court's letter opinion mistakenly stated that the settlor had limited disqualifying conduct to "*this* trust agreement." J.A. at 125 (emphasis in original). But the clause more broadly forbade interference with "the administration of this trust." Id. at 299. At

35

attorney fees, the trustee's counsel also stated: "I don't think [the sons' counsel] actually made the argument that was the basis for your decision. I'd never heard that until the Court raised it itself at the end of the case." Id. at 260. The court disagreed, denied the motion, reaffirmed its reasoning in the letter opinion, and entered a final order finding, for the first time, that the trustee was guilty of "bad faith" when she made her no-contest determination. Id. at 131.

## II.

On appeal, the trustee raises several assignments of error seeking a reversal. The sons raise cross-assignments of error seeking an affirmance for reasons that the trial court either rejected or failed to address. All of the assertions of error, however, cluster around a single question: Did the sons plead and prove sufficient grounds for the trial court to overturn the trustee's no-contest determination?

### A. THE THRESHOLD QUESTION OF DEFERENCE TO THE TRUSTEE'S DETERMINATION

The ultimate question in this case — whether the trial court correctly set aside the trustee's determination — requires us first to decide what, if any, judicial deference the trial court owed the trustee. The parties sharply differ on the answer to this threshold issue.

Quoting from the text of the no-contest provision, the trustee points out that the trust obligated her to determine if any beneficiary had violated the provision. She could not look the other way in the face of an apparent violation because the provision stated that the violator's share of the trust "shall be revoked," id. at 299, if a violation occurred. The provision then ends

the hearing on the motion for reconsideration, the trustee identified the court's faulty recollection of the trust language, noting that the court had erroneously read the clause to prohibit challenges to or interference with the September trust *agreement*, rather than the trust itself. Because the clause actually reads "interference with the trust," the trustee argued, "the logic of the decision . . . comes apart." Id. The trustee also noted that the September 2012 amendment specifically "ratified and confirmed" the "Trust Agreement." Id. at 300.

36

with a clear, but not absolute, allocation of delegable authority: "Absent proof of fraud, dishonesty, or bad faith on the part of my Trustee, the decision of my Trustee . . . shall be final." Id.

The sons concede that the text of the provision says what it says, but they contend that it violates §§ 64.2-703(B) and 64.2-777 of the Virginia Uniform Trust Code. They argue that these provisions, coupled with general equitable principles governing trusts, render unenforceable on public policy grounds the "shall be final" wording of the no-contest provision. From there, the sons reason that the trial court should have reviewed the trustee's decision de novo (without the need for a last-minute bad faith finding) and should have concluded (for various other reasons) that the sons did not violate the no-contest provision.

Consideration of this threshold issue should begin with a review of the history of no-contest provisions and the settled principles governing them. There appears to be something basic and natural about a giver wanting his gifts, particularly those given after his death, to be received without rancor and disputation. Examples of testamentary no-contest provisions date back to the ancient times.[4] English common law and chancery courts enforced no-contest provisions, subject to various limiting principles, throughout the 17th and 18th centuries.[5] Early American courts did as well. See, e.g., Smithsonian Inst. v. Meech, 169 U.S. 398, 415 (1898) (noting that "courts wisely hold" that a testator may "condition" a bequest on a requirement that a legatee "acquiesce" with the terms of the will).

---

[4] See generally Gerry W. Beyer et al., The Fine Art of Intimidating Disgruntled Beneficiaries With In Terrorem Clauses, 51 SMU L. Rev. 225, 230-31 (1998).

[5] Id. at 231-40; see also Olin L. Browder, Jr., Testamentary Conditions Against Contest, 36 Mich. L. Rev. 1066, 1093-96 (1938); Jack Leavitt, Scope and Effectiveness of No-Contest Clauses in Last Wills and Testaments, 15 Hastings L.J. 45, 47-49 (1963).

We have made clear that no-contest provisions are prima facie valid in Virginia. See Womble v. Gunter, 198 Va. 522, 525, 95 S.E.2d 213, 216 (1956) (approving such a provision in a will); Keener v. Keener, 278 Va. 435, 442, 682 S.E.2d 545, 548 (2009) (extending approval of no-contest clauses to trusts). Equally clear is that we have adopted no hard-and-fast rules governing their scope. It is the settlor's intent that controls: "What activity or participation constitutes a contest or attempt to defeat a will depends upon the wording of the 'no contest' provision and the facts and circumstances of each particular case." Keener, 278 Va. at 441, 682 S.E.2d at 548 (quoting Womble, 198 Va. at 529, 95 S.E.2d at 219); see also 1 T.W. Harrison & James P. Cox, Harrison on Wills and Administration for Virginia and West Virginia § 21.05[4], at 21-13 (4th ed. 2007).

In Keener, a trust provision stated that any beneficiary who "objects to or contests" the trust "shall forfeit" his distributable share except for $1.00. 278 Va. at 439, 682 S.E.2d at 546. Quoting from Womble, we reaffirmed that the "wording of the 'no contest' provision" determines its scope and identifies the circumstances that constitute "a contest or attempt to defeat" the trust. Id. at 441, 682 S.E.2d at 548. We also emphasized that a no-contest provision should be "strictly enforced according to its terms," even if doing so had the effect (at least in a pour-over trust) of "disinheriting all the members of the testator's family," including "infants" otherwise entitled to a distribution. Id. at 442, 682 S.E.2d at 548.

"[C]ompelling reasons" justify the "strict enforcement" of such provisions, we held, because they protect the right of a testator or settlor "to dispose of his property as he sees fit" and safeguard "the societal benefit of deterring the bitter family disputes that will [and trust] contests frequently engender." Id. (citing Womble, 198 Va. at 526-27, 532, 95 S.E.2d at 217, 220-21). Somewhat paradoxically, however, Keener also said that no-contest provisions should be

"strictly construed" because the testator or settlor "has the opportunity to select the language that will most precisely express [his] intent." Id. at 442-43, 682 S.E.2d at 548.

The synthesis of strict enforcement and strict construction makes sense only by separating the related, but conceptually distinct, issues of legal validity and textual construction. Virginia courts do not begrudgingly enforce no-contest provisions. To the contrary, the "clear terms" of such provisions must be "strictly enforced," id. at 442-43, 682 S.E.2d at 548-49, without regard to the severity of the result. On the other hand, the inflexibility of strict enforcement cannot be predicated on supposed inferences of settlor intent that are not reflected in the actual text of a no-contest provision. In this sense, we strictly construe the text to the extent necessary to ensure that the plain meaning of the provision clearly calls for forfeiture, which, admittedly, is a result typically disfavored in law.[6]

Keener is a good example of both ideas working together. We reaffirmed that the "wording of the 'no contest' provision and the facts and circumstances" of each case determined what "constitutes a contest" and an "attempt to defeat" the trust. Id. at 441, 682 S.E.2d at 548 (citation omitted). We also did not hesitate to say that such a provision should be strictly enforced. Even so, we held that the provision in that case, by its plain terms, applied only to contests of "any provision of this *Trust*" and did not purport to apply to contests of a related will. Id. at 443, 682 S.E.2d at 549 (emphasis added); accord Virginia Found. of Indep. Colls. v. Goodrich, 246 Va. 435, 439, 436 S.E.2d 418, 420 (1993) (holding that seeking guidance from the court in interpreting a will was not a challenge "questioning" the testator's intent under the no-

---

[6] On this point, I concur with Professor Leavitt's reconciliation of these two seemingly discordant principles: "It is true that a forfeiture clause is to be strictly construed, but it is equally true that if the provisions are not strictured by law or by public policy they will be enforced according to the ascertained intent of the testator." Leavitt, supra note 5, at 64.

39

contest clause in that case). The principle of strict construction precluded us from judicially extending the no-contest provision beyond its plain terms.

In this case, the trustee argues that the no-contest provision passes easily through the filter of strict construction. Without proof that the trustee is guilty of "fraud, dishonesty, or bad faith," her determination of whether a beneficiary has violated the no-contest provision "shall be final." J.A. at 299. I agree that the plain meaning of this provision has no textual ambiguity requiring judicial strict construction. See generally Citizens' Bank v. Parker, 192 U.S. 73, 85-86 (1904) (noting that the "proper office" of the rule of strict construction "is to help to solve ambiguities" but that "it is the judicial duty" to first "ascertain if doubt exists").[7] Text that has a plain meaning needs no judicial construction. See Conner v. Hendrix, 194 Va. 17, 25, 72 S.E.2d 259, 265 (1952) ("'The province of construction lies wholly within the domain of ambiguity.' If it is too plain to misunderstand, there is nothing to construe." (quoting Norfolk Motor Exch., Inc. v.Grubb, 152 Va. 471, 478, 147 S.E. 214, 216 (1929)); see also Virginia Broad. Corp. v. Commonwealth, 286 Va. 239, 249, 749 S.E.2d 313, 318 (2013); Smith v. Smith, 3 Va. App. 510, 513-14, 351 S.E.2d 593, 595-96 (1986). "An absolute unqualified sentence or proposition," Sir Edward Coke reminds us, "needs no expositor." 2 Sir Edward Coke, Institutes of the Laws of England 533 (15th ed. 1797) (translation of original text).

Perhaps so, the sons respond, but this particular language should not be enforced because it violates the Virginia Uniform Trust Code and general equitable principles governing trusts. This argument, however, runs afoul of the principle of "strict enforcement" and the "compelling

---

[7] See also Lincoln Nat'l Life Ins. v. Commonwealth Corrugated Container Corp., 229 Va. 132, 136-37, 327 S.E.2d 98, 101 (1985) (applying the principle of strict construction to an insurance policy "[b]ecause the policy language is ambiguous"); Williams v. Mutual of Omaha, 297 F.2d 876, 879 (4th Cir. 1962) (analyzing an insurance contract and stating that "no ambiguity arises for application of the principle of strict construction").

reasons" recognized by law for such provisions, including the settlor's right "to dispose of his property as he sees fit" and the accompanying "societal benefit of deterring the bitter family disputes that will [and trust] contests frequently engender." Keener, 278 Va. at 442, 682 S.E.2d at 548 (citing Womble, 198 Va. at 526-27, 532, 95 S.E.2d at 217, 220-21).

Contrary to the sons' view, nothing in the Virginia Uniform Trust Code precludes strict enforcement of their father's no-contest provision to the facts of this case. Code § 64.2-703(B)(2) requires trustees to "act in good faith and in accordance with the terms and purposes of the trust and the interest of the beneficiaries." See also Code § 64.2-777(B) (subjecting the trustee's "exercise of a power . . . to the fiduciary duties prescribed by this article"). The no-contest provision does not offend this statutory duty. The provision itself requires the trustee's determination to be disregarded if it is a product of "bad faith." J.A. at 299. It also removes finality from any trustee's determination infected by "fraud" or "dishonesty." Id.

It is true that Code § 64.2-765 also codifies the equitable duty of impartiality in the context of "two or more beneficiaries" and requires a trustee to treat "impartially" their "respective interests." The "substantive" aspects of impartiality generally prohibit unfair "favoritism" between beneficiaries and require diligent "good-faith" efforts to honor the respective interests of competing beneficiaries. Restatement (Third) of Trusts § 79 cmt. c (2007); see, e.g., 14 George Gleason Bogert et al., The Law of Trusts and Trustees § 612, at 49 (3d ed. 2000) (noting that the impartiality duty is often implicated when a trustee's "investment transactions" favor one set of beneficiaries over another).

In this case, I see no need to address whether the equitable duty of impartiality is merely a conceptual species within the genus of fiduciary good faith or, instead, whether the two involve wholly dissimilar concepts. The sons do not assert any violation of Code § 64.2-765, nor did the

41

trial court find any evidence of impermissible partiality. This is understandable given that the stepmother did not gain any financial benefit from the trustee's determination on the no-contest provision. The only real monetary contest was between the sons, as named remainder beneficiaries, and the charitable organizations, as contingent remainder beneficiaries.

I also disagree that the trustee's determination in this case was in defiance to "the terms and purposes of the trust and the interests of the beneficiaries." Code § 64.2-703(B)(2). The no-contest provision *is* one of the "terms" of the trust that effectuates the "purposes" of the trust. Id. If either brother violated the provision, it declares that his share "shall be revoked." J.A. at 299. The trustee complied with the terms and purposes of the trust when she shouldered the responsibility of determining whether the sons had violated their father's emphatically worded prohibition on conduct that "directly *or* indirectly, by legal proceedings *or* otherwise" constituted a "challenge *or* contest" of "this trust agreement *or* any of its provisions" or constituted an "attempt in any way to interfere with the administration of this trust according to its express terms." Id. (emphases added). The trustee's exercise of her duties under the no-contest provision did not violate "the terms and purposes of the trust." Code § 64.2-703(B)(2).

The sons emphasize that the trustee's duty to protect the "interests of the beneficiaries" still remains. Id. While this is true, a trustee cannot protect the beneficiaries' interests more sedulously than the settlor intended. A no-contest provision represents strong medicine for the fractious intra-family contests that sometimes follow the death of a settlor. But it is the settlor's assets being distributed to his beneficiaries. Thus, it is the settlor, not the beneficiaries, who

42

determines the legally recognizable "interests of the beneficiaries." Id. The trustee cannot expand or contract those interests in violation of the settlor's expressed intent.[8]

In short, the no-contest provision in this case needs no judicial construction, strict or otherwise, with respect to the trustee's role in determining whether a violation has occurred. The trustee's determination "shall be final" absent "proof of fraud, dishonesty, or bad faith." J.A. at 299. This delegation of discretion to the trustee benefits from the "strict enforcement" these provisions should be given by the courts in light of the "compelling reasons," Keener, 278 Va. at 442, 682 S.E.2d at 548 (citing Womble, 198 Va. at 526-27, 532, 95 S.E.2d at 217, 220-21), for their presumed validity. The sons offer nothing from the Virginia Uniform Trust Code or general trust principles to rebut the judicial presumption of strict enforcement.

### B. THE SONS' PROPOSED "ARBITRARY AND CAPRICIOUS" STANDARD

Virginia has more than a century of jurisprudence addressing specific settlor grants of broad discretionary authority to trustees. A long line of authorities limits judicial review to allegations of trustee fraud, bad faith, or other misconduct of similar magnitude. See, e.g., Givens v. Clem, 107 Va. 435, 437-38, 59 S.E. 413, 414 (1907) (stating that "a court of equity has no jurisdiction to interfere" with a discretionary trust "so long as the trustee acts in good faith"); Trout v. Pratt, 106 Va. 431, 442, 56 S.E. 165, 169 (1907) ("If the trustees exercise their discretionary powers in good faith and without fraud and collusion the court cannot control or review their discretion." (citation omitted)); Dillard v. Dillard, 97 Va. 434, 442, 34 S.E. 60, 63

---

[8] On this last point, it bears mentioning that the sons only address their personal interest as remainder beneficiaries. They fail to acknowledge that their father also designated charitable organizations as contingent remainder beneficiaries that would take the sons' shares of the trust if the sons were found to have violated the no-contest provision. The sons fail to explain why these contingent remainder beneficiaries should not also be considered within the command of Code § 64.2-703(B)(2) that the trustee take into account the "interests of the beneficiaries."

(1899) (same);[9] 1 Harrison & Cox, supra, § 21.13, at 21-42 ("It is well settled in Virginia . . . that where the trust is discretionary or one of personal confidence a court of equity has no jurisdiction to interfere with its exercise by the trustee so long as he acts in good faith."); see also McCamant v. Nuckolls, 85 Va. 331, 337-38, 12 S.E. 160, 162 (1888) ("As regards such powers as are discretionary and depend on the opinion and judgment of the donee of the power, the courts, unless in cases of fraud, have no jurisdiction to interfere." (alterations omitted)); Cochran v. Paris, 52 Va. (11 Gratt.) 348, 356-57 (1854) (noting that, under Virginia law, trustee determinations committed to their "pure personal judgment" are matters that "cannot in general be assumed or even controlled by the court").[10]

The no-contest provision in this case incorporated similar limitations on the trustee's authority by withdrawing the settlor's authority to make a "final" determination if it is infected by "fraud, dishonesty, or bad faith." J.A. at 299. The sons argue that this restriction does not go far enough. They propose that we adopt an "arbitrary and capricious" standard of judicial review

_____

[9] In Dillard, the testatrix of a will vested her testamentary co-trustees with "an absolute and uncontrollable discretion" regarding the gift of certain real estate to her son. Id. at 440, 34 S.E. at 62. In her will, she expressly stated that the trustees "shall not be compelled, or be liable to be compelled to do so, either at law or in equity" to act other than their judgment required, thus implying the finality of their decision. Id. We affirmed the "uncontrollable power of the trustees," id. at 441, 34 S.E. at 63, and noted that "[w]here the trust is discretionary, or one of personal confidence, a court of equity has no jurisdiction to interfere with its exercise by the trustee so long as he acts in good faith," id. at 442, 34 S.E. at 63; see also James Hill, A Practical Treatise on the Law Relating to Trustees 715 (2d Am. ed. 1854) ("As a court of equity will not in general assume the exercise of a discretionary power vested in trustees, so it will not interfere to control the trustees acting *bona fide* in the exercise of their discretion.").

[10] This approach is consistent with the majority of other jurisdictions, which similarly limit the scope of judicial review in cases in which a trustee possesses "more extensive discretion" to determinations of "whether the trustee acted or failed to act in good faith and with proper motive." 4 George Gleason Bogert et al., The Law of Trusts and Trustees § 228, at 564 (3d ed. 2007); see also id. § 228, at 563 nn. 3-4 (collecting cases reviewing actions of trustees with absolute discretion for bad faith, fraud, improper motive, malice, dishonesty, or failure to act in the interest of the beneficiaries). However, "[a]t the other end of the continuum, where the trustee's discretion is least extensive, courts may give the trustee less latitude and review for reasonableness." Id. § 228, at 565.

44

to cover situations when a trustee makes an outrageously wrong determination under a no-contest provision of this kind — but does so innocently, with honest motives, and in good faith. Appellees' Br. at 14-18. I find the argument purely academic in this case. Even if such a standard judicially supplemented the language of the no-contest provision in this case,[11] nothing in this record comes close to showing that the trustee's determination was arbitrary and capricious.[12]

The sons' first attempt to implicate their proposed standard is to say that the trustee's interpretation of the no-contest provision was grossly in error because the provision only applies to litigation contests. I see no merit in this argument. The father intended the forfeiture to be mandatory ("shall be revoked") if either son directly or indirectly asserted a challenge or contest via litigation ("by legal proceedings") or by any other means ("or otherwise"). J.A. at 299. He also intended the forfeiture to be similarly mandatory if his sons "attempt[ed] in any way to interfere with the administration" of the trust. Id. No legitimate exercise in textual interpretation would justify the conclusion that this provision applies only to contests and challenges asserted

---

[11] I acknowledge our cases stating that a trustee may not abuse her discretion by exercising it "in such an arbitrary manner, as, in effect, to make it a means of destroying the trust." Rinker v. Simpson, 159 Va. 612, 621-22, 166 S.E. 546, 549 (1932); see also NationsBank of Va., N.A. v. Estate of Grandy, 248 Va. 557, 561-62, 450 S.E.2d 140, 143 (1994); Trout, 106 Va. at 443, 56 S.E. at 169. In both Rinker and Trout, however, the trust instrument vested absolute discretion in the trustee, making no express exception for the presence of fraud, dishonesty, or bad faith, as the father did here. See J.A. at 299. In Grandy, we restated the equitable principle raised by Rinker, but we held that the trial court had "impermissibly substituted its judgment for that of the trustees." Grandy, 248 Va. at 562, 450 S.E.2d at 144. In these cases, we merely recognized, as the Virginia Uniform Trust Code does now, that broad trustee discretion cannot be employed to destroy the trust, which would be the ultimate defiance of the settlor's intent. See Code § 64.2-703(B)(2). Enforcing the no-contest clause in this case, which expressly nullifies the trustee's discretion in cases of "fraud, dishonestly, or bad faith," J.A. at 299, cannot reasonably be said to have this effect.

[12] For reasons previously mentioned, supra at 41-42, I do not address whether the no-contest provision would preclude a court from examining whether a trustee's determination violated Code § 64.2-765's duty of impartiality.

in court.[13]  As I noted earlier, the "wording of the 'no contest' provision" determines its scope and identifies the circumstances that constitute "a contest or attempt to defeat" the trust.  Keener, 278 Va. at 441, 682 S.E.2d at 548 (quoting Womble, 198 Va. at 529, 95 S.E.2d at 219).  We have never held that Virginia law invalidates no-contest provisions worded in such a way as to apply to contests short of litigation, and I see no reason to do so now.

Next, the sons say that the trustee's determination offended their proposed arbitrary-and-capricious standard because the trustee failed to take into account that they backed down after they realized their actions put their inheritance in jeopardy.  This assertion may have some emotive value, but that does not translate into legal relevance.  The law does not give parties an inviolate right to cure a fully consummated breach.  Nor has any precedent ever suggested that the legal efficacy of a conditional gift necessarily depends on the donee's knowledge of the condition.  And for good reason:  If there were such a rule, a donor's condition could be avoided unilaterally simply by a donee willfully ignoring it, falsely claiming ignorance, or conceding knowledge of the condition but protesting his misunderstanding of it.  I thus cannot conclude that the trustee acted arbitrarily or capriciously by not giving dispositive weight to the sons' expression of regret for their actions upon discovering their father's no-contest provision.[14]

Even in cases in which the no-contest provision applies only to litigation contests, the "general rule is that 'a resort to the means provided by law for attacking the validity of a will amounts to a contest, although the contestant subsequently withdraws before the final hearing

---

[13] The trial court appears to have agreed.  The court's letter opinion, incorporated by reference into the final order, stated:  "The Court concludes that the aforesaid letters [directed by the sons to the trustee's counsel and to the stepmother] were as enumerated in the 'no-contest' provision."  J.A. at 125.

[14] The trial court appears to have agreed with this point as well.  The court's letter opinion concluded that the "fact that neither brother was aware of the [no-contest] provision" was "not dispositive."  Id.

and even though the contestant subsequently treats the will as valid and seeks construction.'" Womble, 198 Va. at 529, 95 S.E.2d at 219 (citation omitted); see also 1 Harrison & Cox, supra, § 21.05[4], at 21-13; Restatement (Third) of Property: Wills and Donative Transfers § 8.5 cmt. d (2003). The same principle equally applies here, where the sons later recanted their fully consummated violation of the no-contest provision that, by its express terms, applied to contests asserted in litigation "or otherwise." J.A. at 299.

Finally, although the sons only briefly mention the point on appeal, I address the theory raised by the trial court during closing argument and adopted in its letter opinion. The court apparently reasoned that the sons had in fact violated the no-contest provision, but that the provision, as the court interpreted it, only applied to contests directed at the September 2012 amendment. In other words, the court held, "There was no prohibition against challenging any prior agreement or *the* trust agreement as written in 1989 or August 27, 2012." Id. at 125 (emphasis in original). I find this argument unpersuasive.

The no-contest provision applies to challenges or contests of "this trust agreement or any of its provisions" — which would necessarily include provisions in earlier versions that the amendment explicitly "ratified and confirmed." Id. at 299-300. The provision also applied to attempts to interfere with the administration of "this trust." Id. at 299. There was, and still is, only one trust. The trust agreement includes the August 2012 restatement and the September 2012 amendment. The September 2012 amendment was as much a part of the "trust agreement" as the August 2012 restatement. Id. at 299-300.

### C. THE TRIAL COURT'S BELATED "BAD FAITH" FINDING

The no-contest provision withdraws the finality of the trustee's determination if the trustee was guilty of bad faith, fraud, or dishonesty. In this case, the trial court's letter opinion

said nothing about bad faith and instead adopted the theory limiting the scope of the no-contest provision only to attacks on the September 2012 amendment. After the trustee's counsel filed and argued a motion to reconsider, the court announced for the first time that the trustee was guilty of "bad faith." Id. at 131.

On appeal, the trustee argues that the trial court sua sponte injected the bad-faith issue into the case and that the sons did not plead bad faith in their complaint. This was the very point, the trustee insists, that she made at her unsuccessful demurrer hearing. The sons' response, at the time of the demurrer, was that their allegations raised "the specter of bad faith" but that they were not attempting to plead or prove bad faith (or dishonesty or fraud) because, to obtain a court order nullifying the trustee's determination, it was "enough" for them "to simply establish that the Trustee 'got it wrong.'" Id. at 74. Consequently, the sons argued that "they did not have to allege bad faith." Appellee's Br. at 14. To be sure, even on appeal, the sons continue to maintain that the "trial court erred in ruling that the Trust was governed by the bad faith standard of the No Contest Clause." Id. at 13; see also id. at 19 (arguing that "[the] bad faith standard should not apply").

Few axioms of Virginia law are better settled than our view that a litigant's "[p]leadings are as essential as proof, and no relief should be granted that does not substantially accord with the case as made in the pleading." Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp., 221 Va. 1139, 1141, 277 S.E.2d 228, 229-30 (1981) (quoting Bank of Giles Cty. v. Mason, 199 Va. 176, 180, 98 S.E.2d 905, 907 (1957)). Therefore, "[n]o court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed." Id. at 1141, 277 S.E.2d at 230 (quoting Potts v. Mathieson Alkali Works, 165 Va. 196, 207, 181 S.E. 521, 525 (1935)). The trial court erred in holding that the

48

trustee acted in bad faith because nothing in the sons' complaint (as the demurrer hearing confirmed) made that allegation. See Oral Argument Audio at 16:55 to 17:15 (concession by sons' counsel that "we did not expressly allege bad faith [in any pleading]").

On this point, I acknowledge the concerns expressed by the sons' counsel on appeal. He suggests that, in the context of a trustee's duties, the concept of bad faith may have a different meaning than the one generally recognized in law. In many contexts, bad faith implies "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed. 1990); see, e.g., Logan v. Commonwealth, 279 Va. 288, 293 n.3, 688 S.E.2d 275, 278 n.3 (2010) (noting that, "in the civil context," bad faith "connotes the 'conscious doing of a wrong'" (citation omitted)).

I need not hypothesize whether an allegation of bad faith connotes something different in a trust case than it does in any other civil case. Nor do I see the need to address whether any evidence in this record would be sufficient to prove an allegation of bad faith — because there never was any allegation of bad faith in this case. See Hoffman v. First Va. Bank, 220 Va. 834, 836, 842, 263 S.E.2d 402, 404, 408 (1980) (affirming the trial court's sustaining of a demurrer and noting that the "amended bill of complaint contained no allegation of fraud, bad faith, or conflict of interest on the part of the Trustee").[15] From the beginning of this litigation until now,

---

[15] See also Trout, 106 Va. at 441, 56 S.E. at 168 (noting that "he who invokes the aid of the court to regulate and control the [broad] discretion with which the [trustee] was clothed must set forth facts and circumstances which will call into activity the power of the court to regulate the broad discretion conferred upon the trustee — must show that the trustee has acted in bad faith"); Virginia-Carolina Chem. Co. v. Carpenter & Co., 99 Va. 292, 293, 38 S.E. 143, 144 (1901) (stating that "a charge of fraud or bad faith must be clearly and distinctly proven").

49

the sons have consistently maintained that they did not need to plead bad faith. Based on that view, they never did.[16]

### III.

In sum, the no-contest provision delegated to the trustee the final decision on whether the sons' conduct following their father's death violated the broad terms of the no-contest provision. Given the evidentiary record and the pleadings before it, the trial court erred in overturning the trustee's decision. In my opinion, the case should be reversed with the entry of final judgment dismissing the complaint with prejudice.[17]

For these reasons, I respectfully dissent.

---

[16] The majority addresses the merits of the unpled bad faith claim, holds that the trustee acted in bad faith, and then concludes that it would not matter "[e]ven if there [were] no evidence . . . of bad faith" because the trial court's finding of bad faith was merely "an alternative or additional ground" for its ultimate, sua sponte holding — *i.e.,* that the no-contest provision only prohibited contests of the September 2012 amendment adding the no-contest provision — which the majority affirms. Ante at 13-14. The majority then faults the trustee for not wording her assignments of error clearly enough to reach the underlying issue. Ante at 14. For several grounds that need no additional elaboration, I cannot concur with this uniquely sequenced line of reasoning.

[17] My view would necessarily require the vacature of the trial court's award of prevailing party attorney fees to the sons under Code § 64.2-795. See Appellant's Br. at 11 (fourth assignment of error).